We have five cases on our calendar this morning. Three will be argued, all patent cases, two from the PTO, one from the district court. We have two submitted cases, an employee case and a veteran's case, and they will not be argued. And first case, first argued case is Bayer Pharma AG et al. v. Watson, Actavis, 2016-21-69. Mr. Jay. Thank you, Your Honor. May it please the court. I have a slightly scratchy voice this morning, and I hope the court will let me know if I'm not able to be heard. William Jay from Goodwin-Proctor for the appellants. This case involves a patent claiming an established drug combined with an off-the-shelf excipient package. And the case really didn't boil down to a dispute between testifying experts, but this is a case, rather, in which the art itself establishes not only the elements that are combined here, but also the motivation to combine them, in this case, the motivation to make an orally disintegrating tablet of pharmaceuticals. Part of the difficulty with your case is that you had so many references that you threw out there. I got the feeling you just were hoping something would stick to the wall, and that you go through the transcripts and there's two sentences on this reference and two sentences on that reference. What are the key references that you want to rely on? I would be happy to go through that, Your Honor. I think there are three really key issues. One is motivation to make an ODT. One is whether the particular mannitol-sorbitol combination would be used. And then one is the teaching away argument that Beyer used. So on the first part, on whether there is a motivation to make an ODT, the two that I'd like to point you onto right off the bat are Chang, which says explicitly that erectile dysfunction drugs can be considered candidates for this dosage form. And then also the Furitsu patent application from the Esai Pharmaceutical Company, which said that there was brisk demand for ODT formulations in the erectile dysfunction area. And those were relied on not just in briefing, but at trial, and you're right, Judge O'Malley, that the discussion of Chang didn't consume a lot of transcript pages. But that's because it's a short reference, and it says what it says. The other side didn't testify about it. Well, tell me what transcript pages really speak to Chang, because there was so little on it that I was having a hard time trying to understand. You can understand a trial judge's frustration when all they've got is a bunch of stuff with very little discussion of them. Sure, and there were other issues being tried in the case, which are not before your honors, that were all crammed into the available time. So what I'd point you onto is appendix page 448, which is where Dr. Jacobs, the defense expert, was asked about Chang, and that's transcript page 311. And that's it? It's like two sentences, right? That's right. And then Chang itself, which of course is in the record at 19024, which I think says, as I've just described it, that these are considered candidates for this dosage form for ODT. And there certainly are other references like that, and I think the point is not necessarily that the judge didn't deal with one individual reference among many. We're not insisting that every single reference cited anywhere needs its own discussion of In this case, the district court did not deal with our affirmative submission, with our affirmative references establishing this motivation in the art at all. The court instead dealt with what I might call the negative motivation, or the sounds of silence argument made by the other side. So what you're saying basically is you could just have a witness and you could say, what's the name of this reference? What's the name of that reference? What's the name of that reference? And that's all you have to do for purposes of proving your case by clear and convincing evidence? Well, I think that the point we were trying to prove is that there was an established motivation, not just based on subjective testimony by an expert, but set out in the art. And there were a series of references that we relied on.  The point that we're relying on is stated explicitly in them. I think if the other side wanted to disagree with the point that we made in any of them, I think it could have brought that out. What it brought out instead was the idea that in two references in particular, Habib and Foo, there are these tables. And the absence of erectile dysfunction from table two in Foo, which is expressly described as examples, that the district court found was an indication that these were not a candidate for formulation of an ODT. We think that if we had made no affirmative submission of reference after reference saying that there was such a motivation, maybe that would be an OK thing for the district to do. But there's no testimony that says that that shows a motivation. That's what I'm trying. That's what my problem is. It says, yes, this is Chang. Boom. You move on to the next reference. Right. But Dr. Jacobs certainly did testify that there was a motivation. He walked through the reasons why this motivation would exist. He explained why that makes sense in the context of an erectile dysfunction drug. So for example, erectile dysfunction drugs. I'd point to me to the best testimony from Jacobs. I know that we've got the issue with it where the trial court found that Jacobs was not credible. Yes. And I wouldn't like to go back and deal with that. I think that the- Did he find Jacobs not credible at all, or did he find Jacobs not credible on particular things, like the type of packaging that would be necessary for drugs and things like that? I think that his complaint with Dr. Jacobs were really two things. One had to do with what he deemed to be deviations from the expert report, and the other had to do with his purported use of hindsight. Now, I don't think that that can impeach the references that Dr. Jacobs explained without putting a spin on it. And him contradicting himself. There are three things. Well, that's the expert report that I'm alluding to, my first answer to Judge Moore. And on that, I take the point that you can't go beyond your expert report, but I think the point is that in his expert report, he said that there is a convenience benefit to having this ODT formulation, and to go- that's fine if he's not able to go beyond that. But the point is that there is this convenience benefit, and that's supported by all of this literature. You know, Foo, for example- But then on cross-examination, he conceded that that convenience benefit really isn't there in a lot of circumstances. Respectfully, no. What he said was that the benefit was marginal, compared to- and he was being asked about a specific tablet form, but he said the benefit was marginal. I think that even if that's right, that that's enough, that a marginal benefit- you know, this is a blockbuster area, perhaps this wouldn't be as big as the original tablet. But there certainly is a motivation in a drug that is targeted to a geriatric population, and the district court found that expressly at page 11. And when the art clearly teaches that that's one of the two target populations for orally disintegrating tablets, it's not a stretch to say that that convenience factor is a reason to make this formulation. And I think it's instructive to look at what the other side put in the other- I understand your point about saying it might not be a stretch, but I guess what I'm trying to put myself into the perspective of what it is we're supposed to do here. We're reviewing a trial court's judgment, and the trial court made credibility, determinations, findings of fact. I mean, teaching away is a finding of fact. So we'd have to find that to be clearly erroneous. Not just that if we were looking at it first, we might agree with you. So I mean, so far you've pointed me to very little in the transcript that is, as you call it, your affirmative case. So what else? What you say that those two references are key references. What are your other key references, or is that it? So I think that there are, in addition to those two, I mean, there are a series of other patents and patent applications that we've cited, each of which stands for the basic health dysfunction drugs generally as a candidate for exploration in this area. And then- Okay. And which references are the key ones for that proposition? Belhoff, I think, and- But you, I mean, this is one of the problems you had in your brief to us, is you tell us Belhoff is a 2002 reference, but it's not. It's a 1998 reference, and the trial judge dealt with that question. Well- I mean, you conceded in your gray brief that, yes, you were wrong on that. That's right. It was published in 2002. But of course, a patent application isn't published if it's been abandoned, right? And so, and Dr. Wicks conceded that there's absolutely nothing in the prior art, nothing, suggesting that anyone would have thought that Pfizer had abandoned the application other than Dr. Wicks' own opinion that, you know, the number of years since the- Well, it's not just his own opinion. I mean, it's our law that talks about the fact that if something sits out there for years and years and years and no one does anything with it, then it at least is indicative that it wasn't so obvious that people would be jumping on the train. I take that point, Your Honor, and if what we were talking about was just an old reference, that would be one thing. But when you have Pfizer's competitors at the same time saying that there's robust demand for this type of product, and in addition, you know, the mere age of reference is not enough. And I think- It's a factor. I get you that. It's not enough. But that's a factor that the trial court relied upon. So what- I mean, you just keep saying there's a bunch of references that you threw out there. This is my very problem with this record. So what other references? What are your key references? You've given me Chang and you've given me Foritsu, right? And you say Bellhoff, but, you know, the trial court dealt with that one. What else? Well, again, the trial court dealt with that only by saying that the absence of a commercial product from Pfizer, you know, the sort of silence from Pfizer after it said it was developing the product, which also dealt with, you know, how we use the reference. The trial judge said that that's an indication that there's no motivation. But ultimately, the teaching of the patent application, still true. I mean, it's still a published piece of art, whether or not it ultimately is commercialized. And I think it's important to look at the context of this product. And I see that I'm into my rebuttal time, but I want to make sure to give this answer. This is a product where there really is only one big drug on the market. It's Viagra. And the other two drugs didn't come along until 2003. So Pfizer may well have had reasons of its own, the lack of competition being the number one reason, not to come out with this own product that doesn't indicate that it wasn't a desirable product or that it couldn't be done, certainly knowing that there's no motivation. If the court has no further questions at this time, I'd like to reserve my right. We will save your rebuttal time, Mr. Jay. Mr. Burrell. Good morning, Your Honors. David Burrell for Beyer. May it please the court. Before addressing the particular arguments that Watson made, I think it's worthwhile to take a step back and observe that, as Judge O'Malley observed, this is not a typical obviousness case where a challenge represents- Because it seems like there are a lot of references that are cited and a lot of references that the expert talked about on motivation to combine and how these references expressly suggest you should take ED drugs and put them in ODT formulations, or alternatively say people are working on developing exactly that. And the district court seemed to kind of fly by it and not really discuss them. So why don't you start with that and tell me why that's not a problem. Yes, I'm happy to, Judge Moore. The district court did in fact consider the testimony of all the references advanced by Watson at trial in support of that proposition. There's no dispute that it was known that erectile dysfunction drugs were candidates for orally disintegrating tablets. But I would submit, and your case law holds, that that's not enough. The question is not what is possible, but what is desirable. And Dr. Wicks, Bayer's expert, testified that Vardenafil would not have been considered a good candidate for an ODT. That's at page A675 and 676 of the appendix. The district court agreed with Dr. Wicks after reviewing all of the testimony and all of the arguments advanced by Watson. And the fact that it was out there doesn't mean that it was desirable. There were many reasons that Watson put forth at trial about why it would be desirable, including what Watson just mentioned, the ease of swallowing. But that point was dealt with at trial. Dr. Wicks testified clearly that that's not a major benefit with respect to erectile dysfunction drugs. And contrary to his direct testimony, Dr. Jacobs, Watson's sole prima facie obviousness expert, admitted that on cross-examination. And Dr. Wicks further testified that if one were concerned... You're saying a lot of this, but as I read the district court's opinion, this doesn't feel to me to be the basis of his fact findings. If you look at his opinions on page eight and nine, he talks about, moreover, the POSA would not have considered Vardenafil to be a good candidate for formulation as an ODT because Vardenafil was known as an erectile dysfunction medication, and ODTs were not considered particularly applicable in this area. Yet all of this prior art, so much of it says ED drugs are good candidates for ODT and Vardenafil in particular, some of them say. So I don't understand how that fact finding isn't clearly erroneous. Because that fact finding doesn't seem to be what you suggested, which is there isn't a good reason to make the combination, so much as him suggesting that it isn't known that ED drugs could be reformulated in ODT format.  The first is that the prior art does not say that Vardenafil or ED drugs are good candidates for ODTs. Rather, it just reflects that there are candidates. Watson uses the term good candidates in their reply brief citing to Chang. One will read Chang in vain for the quote good candidate. It simply is not there. The prior art simply reflects that it was a candidate for an ED drug, and the district court agreed with that. I don't understand, Foritsu, which can be found at the appendix at 19077, is a European patent application directed to exactly this. The title is tablets immediately disintegrating in the oral cavity, and it's all about the ED drugs. I mean, that's what I understand. I'm going to probably say it wrong, but phosphodiesterase? Phosphodiesterase. That's close. That's close. The principle here, Your Honor, is that Bayer did not dispute a trial, and the district court does not dispute in its opinion that it was known that ED drugs could be used as ODTs. But this court's case law is consistent. That simply is not enough. The question, as this court put it in Winner v. Wang, is not what is feasible, but what is desirable. It was known in that case that a single prior art reference, the Warhawk reference, disclosed a chisel block option and a deadbolt option. It was known, just as it's known here, that ED drugs can be used as ODTs. And the court said, there's nothing that teaches you to do it as a deadbolt rather than a chisel block. Same result in Rolls-Royce. It was known that they could reverse the sweep angle. I don't understand. If everybody knew how to make ED drugs as an ODT, how is that claimed composition not then obvious? Well, a few- It's almost like you want to prove that it would be a commercially good idea to go that way. And I feel that the district court's opinion had many of those, unfortunately, same trappings where he kept making the comparison to Levitra. Why would anybody change Levitra? Well, that's the commercial embodiment, and that's not the right focus. The question is- And you pretty much acknowledged in your brief that that wasn't the right focus, because it's not. The focus isn't on the commercial product. Except respectfully, that wasn't the sole focus of the district court. And to the extent the district court focused on it, it was because Watson put forth that evidence at trial, and the district court was dealing with the alleged commercial motivation that Watson advanced. The district court was simply responding to Watson's arguments, but I think more fundamentally, the question of whether the ODT would have been used for Vardenafil is just one of three propositions that Watson acknowledges it must prove by clear and convincing evidence, and that it must show clear error in the district court's opinion. Even if one were to somehow conclude that the district court erred in finding as to question one, that Vardenafil may have been obvious as an ODT, and the persuasive expert testimony, I think, shows otherwise, there's still no error in the proposition that one would not have used mannitol and sorbitol together in such an ODT, let alone- The district court, it seems, failed to acknowledge Joshi, and I don't know if I'm saying that right, J-O-S-H-I at all. In fact, when he says at page 12 of his opinion, additionally, there was nothing in the prior art that would have given the POSA a reason to use sorbitol in addition to mannitol in an ODT. That statement is absolutely false in light of Joshi, which is the use of mannitol and sorbitol, and it was clearly presented, so how do you defend that? Because, again, the question, Your Honor, is not what is disclosed, but what would have been desirable. No, that's not what his- No, that's his finding of fact. His finding of fact is not what is desirable. His finding of fact is there was nothing in the prior art that would have given a POSA a reason to use sorbitol and mannitol in an ODT, and yet Joshi is exactly on that point, the use of sorbitol and mannitol, and says it overcomes- I'm fracking, fricking, I don't know, something. It overcomes something. The thing where the pill crushes up and- Friability, Your Honor. The reason, when he talks about there is no reason in the prior art, that's what I'm using as a proxy for desirability. There has to be a reason to do something- And Joshi says it overcomes, what was it? Friability. Friability. And Dr. Wicks explains, first of all, at page A685 through 686, that mannitol and sorbitol would not have been expected to overcome the friability problem, first of all. And second of all, he explains at 685, 686, and 701, that the newer Durasolve and WowTab formulations that have mannitol only, overcome any friability problems and do not require specialized packaging, and that is what a person of ordinary skill would have wanted to use. He says at 676 and 683, that a person of ordinary skill would have wanted to use established technology, and he gives reasons for that, it would have been cheaper, there were regulatory advantages for doing that, and the district court on this point found Dr. Wicks persuasive and found Dr. Jacobs unpersuasive. The question is not what the prior art means to you or me or to a lawyer, the question simply is what the prior art means to a person of skill, and on that point, Dr. Wicks testified clearly that there was no reason in the prior art to use mannitol and sorbitol rather than mannitol alone. That is what every single commercial embodiment used, and that's what everyone would have used at the priority date in 2005. The question is not what was available, the question is what would have been desirable. Watson's own cases reflect that proposition, the Henry Fulton case it cites provides an actual reason that was persuasive to the court in order to find something that was obvious. Maybe the reason is because PharmaBurst was an off-the-shelf product that was commercially available and in fact used in this case, and that PharmaBurst was well-known in the art at the time. Well, the fact that it was used in this case can't be used in evaluating the obviousness of the invention. That's what the inventors did, but the fact that it was available, again, doesn't make it desirable. It means that someone could have used PharmaBurst, but no one would have used PharmaBurst. A person of ordinary skill would have opted for mannitol only for all of the reasons described by Dr. Witts in his testimony at 676 and 685. The third issue here, though, even if one were to get past using a Vardenafil ODT and using mannitol and sorbitol, both of which the district court addressed and rejected, is the third issue, whether one would have used an immediate release formulation. And here, Watson asserts no legal error whatsoever and not a single piece of prior art. There is no contemporaneous evidence suggesting that someone would use an immediate release formulation. Their argument rests entirely on the testimony of their expert, Dr. Jacobs, who, again, the district court found not credible and not persuasive. It cannot be clear error for the district court to have concluded that the discredited expert of Watson's, the discredited testimony of Watson's expert was insufficient to carry a clear and convincing burden. There were two reasons that Dr. Witts explained a person of ordinary skill would not have used an immediate release formulation. The first was bioavailability, which the district court adopted at A11. Dr. Witts explained on the basis of the Levitra label, that's at 19413, that a person of ordinary skill would have considered increased bioavailability dangerous. And the way to get around that problem, the solution to that problem, he explains at 679 through 681, is to make a delayed release ODT. Dr. Jacobs never testified in response. Watson had no response whatsoever for that testimony. It went in unrebutted, and on appeal, Watson somehow suggests that Dr. Jacobs did testify about it. Even were that so, Dr. Jacobs was found to be not credible. But it's not so. Check the citation, A457 and 458. He's not testifying about the label at all. He's simply saying low bioavailability of Levitra would not be a problem. That's a separate issue from the one that Dr. Witts addressed and the district court adopted. A person of ordinary skill would have wanted the same bioavailability of Levitra and would have considered increased bioavailability dangerous and problematic. That is a factual finding of the district court, and respectfully, there is no basis whatsoever to reverse that finding. Dr. Witts' testimony was based on contemporaneous prior art. The Brown reference at A16088, which says that in these circumstances where one has an existing product on the market, when one's making an ODT, the ODT must be bioequivalent. I'm having a little bit of trouble following your argument right now. Are you directing your argument at his teaching away finding based on bioavailability and taste? Is that what you're talking about? I frankly don't see it as just a teach away argument. I think that Watson bears the burden to show a motivation, a reason to use immediate release, and the prior art pot away from it. Yes, but the teaching away based on bitterness of the taste and the bioavailability, even if that was a fact finding that wasn't clearly erroneous, you still have to put that on the scale. Obviousness is a question of law, and we balance all of it. Is there a motivation combined? Well, there are certainly some, at a minimum, obstacles or setbacks if we accept the teaching away arguments. However, if seven or so references actually expressly indicate that ODTs are good candidates, I understand you don't think they say that, but suppose that I did, ODTs or ED drugs are good candidates for making it an ODT formulation, you would weigh all of that together, wouldn't you? These aren't separate arguments. This all goes to whether there's a motivation, and basically, it seems to me, these all go to the ultimate question of obviousness, where we have to weigh everything, de novo. Respectfully, I think they are separate questions, Your Honor. This claim is not directed to a Vardenafil ODT. It's directed to an immediate release Vardenafil ODT, so that the question of all these references that Your Honor referred to that say it's a good idea to have a Vardenafil release ODT, none of them say immediate release. None of them get you to the claim. There is a separate burden that Watson must carry, and Watson embraced that at trial and agrees on appeal, that it must carry a clear and convincing burden that a person of ordinary skill would have used an immediate release ODT. That's a separate question that the district court addressed, and that this court would then have to address. And on that question, there is no prior suggesting. Watson asserts nothing. All it had was the testimony of its expert, who again, was found to be non-credible and non-persuasive, and even he didn't testify as to the crucial piece of evidence as to bioavailability, which was the Levitra label at A19413. So even setting aside any possible dispute about whether it would have been obvious to make a Vardenafil ODT, or whether it would have been obvious to use Sorbitol and Manitol together, this third point stands alone as a basis for affirmance, and respectfully, Watson has no evidence to sustain its burden and cannot show clear error on appeal. Thank you, Mr. Burrell. Thank you. Mr. J has some rebuttal time, three minutes plus. Thank you, Your Honors. In my rebuttal, I'd like to touch briefly on Manitol-Sorbitol and on the Peachaway point. And the colloquy with Judge Moore about Joshi, I think, has brought out the really key point about Manitol and Sorbitol. The other side's case does not deal with the key point from Joshi, which is low compression forces. Adding Sorbitol allows you to do the same thing to the friability benefit at lower compression forces, which doesn't sacrifice dissolution speed. This is testified to at 453, but it's all set out right there in Joshi. On the immediate release formulation, Dr. Jacobs testified at 455 and 56 that you would make an immediate release formulation if you could, unless there was a reason not to, because it is much, much simpler than the delayed release formulation. And on that, the- Where is that testimony? 455 to 56. Now, my friend is trying to say that Dr. Jacobs was found not credible, but certainly the credibility finding has nothing to do with anything in that testimony. There's no deviation from the expert report. There's no allegation that he came up with that through hindsight. On the Levitra label, as we pointed out, from the Levitra label itself, and this is pointed out in our post-trial briefing as well, at page A19314, which I think is the right page site, the label itself says that Levitra is safe and effective, including for geriatric patients, at 5 milligrams, 10 milligrams, and 20 milligrams. The only basis for this teach-away argument is that they recommend starting geriatric patients at a lower dosage, at 5 milligrams. But they say it is safe for all patients at all of these dosage strengths. The district court simply did not deal with that. Back, if I may, to the documentary evidence in the prior arc. So, ultimately, what the district court chose to rely on was the- what I refer to as the sounds of silence argument. The absence of erectile dysfunction drugs from these two tables, in Habib and in Fu. And that cannot contradict the affirmative statements in the arc that a person of skill in the art would have a motivation to make this. As my friend said, at page 690, Dr. Wicks conceded that at least- that they were at least candidates. And the reason that they are good candidates is set out in our affirmative case. Now, the district court did not, as my friend would have it, credit the idea that swallowing is not a benefit. If you look at page 676, what their expert testified to, what Dr. Wicks testified to was that for Vardenafil in particular, he's relying on the Freiberg patent. Swallowing is not a benefit because in- sorry, a patient with a swallowing disorder would not use an ODT because they would instead use a parenteral or a bocal or a sublingual formulation. The district court did not credit that testimony. And it's frankly not credible because the idea- that patent doesn't even deal with erectile dysfunction use. It deals with the use of Vardenafil for another use, treating diabetes mellitus. And the idea that parenteral use, like injections, would be an alternative for someone who has distaste for swallowing a larger pill is just not credible. The art teaches that ODTs are desirable to patients who don't like swallowing tablets. And the patient population and the uses of this drug are right in the heartland of what ODTs are. Thank you, Mr. Jay. You have your argument. We'll take the case under advisement.